No. 13-40692

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

BILL HENDRICKS and AUBREY B. STACY,
*Plaintiffs-Appellees*,

*v.*

UBS FINANCIAL SERVICES INC.,
*Defendant-Appellant*.

_____

Consolidated with No. 13-40693

MARK T. EDDINGSTON, JEFFERY M. DAVIS,
ELRIDGE NICHOLAS BOLLICH, and RAY A. COX,
*Plaintiffs-Appellees*,

*v.*

UBS FINANCIAL SERVICES INC.,
*Defendant-Appellant*.

_____

On Appeal From The United States District Court
For The Eastern District Of Texas
Civ. Nos. 2:12-cv-00606, 2:12-cv-00422

_____

### APPELLANT'S OPENING BRIEF

_____

Mark A. Perry
Eugene Scalia
Paul Blankenstein
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Attorneys for Defendant-Appellant UBS Financial Services Inc.*

## CERTIFICATE OF INTERESTED PERSONS

*Hendricks v. UBS Financial Services Inc.*, No. 13-40692

(Consolidated with *Eddingston v. UBS Financial Services Inc.*, No. 13-40693)

The undersigned counsel of record certifies that the following interested persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this consolidated case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### Plaintiffs-Appellees:

*Hendricks v. UBS Financial Services Inc.* was brought by two plaintiffs: Bill Hendricks and Aubrey B. Stacy. These plaintiffs seek to represent a putative class of former branch managers for UBS Financial Services Inc., who left the company before January 1, 2011, and forfeited unvested amounts under the PartnerPlus Plan.

*Eddingston v. UBS Financial Services Inc.* was brought by four plaintiffs: Mark T. Eddingston, Jeffrey M. Davis, Elridge Nicholas Bollich, and Ray A. Cox. These plaintiffs seek to represent a putative class of former financial advisors for UBS Financial Services Inc., who left the company before January 1, 2011, and forfeited unvested amounts under the PartnerPlus Plan.

Plaintiffs in both cases are represented by the same counsel.

*Attorneys for Plaintiffs-Appellees*:

Robert E. Goodman, Jr.
Theodore Carl Anderson, III
Ashley E. Tremain
KILGORE & KILGORE
3109 Carlisle
Suite 200
Dallas, TX 75204
(214) 969-9099

Jennifer Leigh Truelove
Samuel Franklin Baxter
MCKOOL SMITH
P.O. Box O
104 East Houston St., Suite 300
Marshall, TX 75670
(903) 923-9000

Brian Edwin Bro
LAW OFFICES OF BRIAN E. BRO
3911 Wood Park
Sugar Land, TX 77479
(713) 961-3111

Theodore Stevenson, III
MCKOOL SMITH
300 Crescent Court
Suite 1500
Dallas, TX 75201
(214) 978-4974

Peter K. Stris
Victor O'Connell
STRIS & MAHER LLP
19210 S. Vermont Ave., Bldg. E
Gardena, CA 90248
(657) 464-0464

## Defendant-Appellant:

Defendant-appellant UBS Financial Services Inc. is a wholly owned subsidiary of UBS Americas Inc., which, in turn, is a wholly owned subsidiary of UBS AG. Shares of UBS Financial Services Inc. are not publicly traded. UBS AG is a publicly owned Swiss banking corporation and does not have a parent company. No publicly held corporations own ten percent or more of UBS AG stock.

*Attorneys for Defendant-Appellant*:

Mark A. Perry
Eugene Scalia
Paul Blankenstein
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

s/ Mark A. Perry_____
Mark A. Perry
*Counsel of Record for Defendant-*
*Appellant UBS Financial Services Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, defendant-appellant UBS Financial Services Inc. respectfully submits that oral argument will assist the Court in resolving the important issues presented by these consolidated appeals.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT .........................................................................3

STATEMENT OF ISSUE PRESENTED FOR REVIEW .......................................3

STANDARD OF REVIEW ......................................................................................3

STATEMENT OF THE CASE..................................................................................4

STATEMENT OF FACTS ........................................................................................5

SUMMARY OF ARGUMENT ...............................................................................14

ARGUMENT ..........................................................................................................16

I.    The Named Plaintiffs Agreed To Valid Arbitration And Class Waiver
      Provisions That Cover This Dispute..............................................................17

      A.    The Federal Arbitration Act Authorizes Only A Limited
            Judicial Inquiry On A Motion To Compel Arbitration .......................18

      B.    The Arbitration And Class Waiver Agreements Are
            Enforceable..........................................................................................24

II.   The District Court Erred In Refusing To Enforce The Arbitration And
      Class Waiver Agreements .............................................................................28

      A.    FINRA Rules Do Not Preclude Arbitration Here ..............................28

      B.    ERISA Does Not Preclude Arbitration Here ......................................42

CONCLUSION .......................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*14 Penn Plaza LLC v. Pyett*,
  556 U.S. 247 (2009) ............................................................24

*Am. Express Co. v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013) ...................................2, 14, 19, 22, 23, 24, 25, 28, 34, 40

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (2011) .........................................2, 18, 22, 23, 24, 34

*AT&T Techs., Inc. v. CWA*,
  475 U.S. 643 (1986) ............................................18, 21, 27, 40, 43, 44

*Baldwin v. Cavett*,
  502 F. App'x 350 (5th Cir. 2012).........................................................25

*Banc One Acceptance Corp. v. Hill*,
  367 F.3d 426 (5th Cir. 2004) ..................................................................3

*Bird v. Shearson Lehman/Am. Express, Inc.*,
  926 F.2d 116 (2d Cir. 1991) ...............................................................51

*Boos v. AT&T, Inc.*,
  643 F.3d 127 (5th Cir. 2011) ..............................................................45

*BP Exploration Libya Ltd. v. ExxonMobil Libya Ltd.*,
  689 F.3d 481 (5th Cir. 2012)...............................................................19

*In re Citigroup, Inc.*,
  376 F.3d 23 (1st Cir. 2004) ................................................................34

*Cohen v. UBS Fin. Servs., Inc.*,
  2012 WL 6041634 (S.D.N.Y. Dec. 4, 2012)..................................32, 33

*CompuCredit Corp. v. Greenwood*,
  132 S. Ct. 665 (2012) .........................................15, 16, 19, 20, 21, 40, 41, 42, 50

*CWA v. Sw. Bell Tel. Co.*,
  415 F.2d 35 (5th Cir. 1969)...............................................................22

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Dean Witter Reynolds Inc. v. Byrd*,
   470 U.S. 213 (1985) ........................................................................... 19, 20

*Doctors Assocs., Inc. v. Casarotto*,
   517 U.S. 681 (1996) ........................................................................... 33, 36

*Fedmet Corp. v. M/V Buyalyk*,
   194 F.3d 674 (5th Cir. 1999) ..................................................................22

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995) ........................................................................... 22, 25

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) ................................................................. 21, 26, 40, 50

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
   130 S. Ct. 2847 (2010) ....................................................................... 14, 20

*Green Tree Fin. Corp. v. Bazzle*,
   539 U.S. 444 (2003) ........................................................................... 22, 30

*Green Tree Fin. Corp.-Ala. v. Randolph*,
   531 U.S. 79 (2000) ..................................................................................21

*Houston v. Saracen Energy Advisors, LP*,
   2009 WL 890384 (S.D. Tex. Mar. 27, 2009) ..........................................48

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ..................................................................................25

*John Wiley & Sons, Inc. v. Livingston*,
   376 U.S. 543 (1964) ................................................................................25

*Kramer v. Smith Barney*,
   80 F.3d 1080 (5th Cir. 1996) ............................................................ 41, 51

*Krumme v. WestPoint Stevens Inc.*,
   143 F.3d 71 (2d Cir. 1998) .....................................................................49

*LaVoice v. UBS Fin. Servs., Inc.*,
   2012 WL 124590 (S.D.N.Y. Jan. 13, 2012) ........................................ 31, 34

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Lee v. Flightsafety Servs. Corp.*,
  20 F.3d 428 (11th Cir. 1994) ................................................................38

*Lewis v. UBS Fin. Servs. Inc.*,
  818 F. Supp. 2d 1161 (N.D. Cal. 2011) ................................... 23, 32, 34

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995) ................................................................................39

*McKee v. Home Buyers Warranty Corp. II*,
  45 F.3d 981 (5th Cir. 1995) ................................................................19

*McKinsey v. Sentry Ins.*,
  986 F.2d 401 (10th Cir. 1993) ............................................................48

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ........................................................................ 24, 39

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ........................................................ 19, 20, 21, 27, 39

*Murphy v. Inexco Oil Co.*,
  611 F.2d 570 (5th Cir. 1980) ..............................................................45

*Nielsen v. Piper, Jaffray & Hopwood, Inc.*,
  66 F.3d 145 (7th Cir. 1995) ................................................................34

*Oatway v. Am. Int'l Grp., Inc.*,
  325 F.3d 184 (3d Cir. 2003) ..............................................................46

*Oster v. Barco of Cal. Employees' Ret. Plan*,
  869 F.2d 1215 (9th Cir. 1988) ............................................................49

*Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local
  No. 4-2001 v. ExxonMobil Ref. & Supply Co.*,
  449 F.3d 616 (5th Cir. 2006) .......................................................... 22, 43

*Perry v. Thomas*,
  482 U.S. 483 (1987) ............................................................................18

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*,
   297 F.3d 288 (5th Cir. 2002) ......................................................... 20, 25

*Petrofac, Inc. v. DynMcDermott Petroleum*,
   687 F.3d 671 (5th Cir. 2012) ...............................................................30

*Place St. Charles v. J.A. Jones Constr. Co.*,
   823 F.2d 120 (5th Cir. 1987) ...............................................................38

*Preston v. Ferrer*,
   552 U.S. 346 (2008) ................................................................ 2, 24, 39

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   7 F.3d 1110 (3d Cir. 1993) ..................................................................51

*Raniere v. Citigroup Inc.*,
   2013 WL 4046278 (2d Cir. Aug. 12, 2013) .........................................23

*Rent-A-Center West, Inc. v. Jackson*,
   130 S. Ct. 2772 (2010) ........................................................................20

*Robinson Brog Leinwand Greene Genovese & Gluck, P.C. v. John M.
   O'Quinn & Assocs., L.L.P.*,
   2013 WL 1707897 (2d Cir. Apr. 22, 2013).........................................36

*Rosenblum v. Drexel Burnham Lambert Inc.*,
   700 F. Supp. 874 (E.D. La. 1987) .......................................................50

*Safer v. Nelson Fin. Grp., Inc.*,
   422 F.3d 289 (5th Cir. 2005) ......................................................... 38, 39

*Scherk v. Alberto-Culver Co.*,
   417 U.S. 506 (1974) ............................................................................19

*Sec. Indus. Ass'n v. Connolly*,
   883 F.2d 1114 (1st Cir. 1989) .............................................................41

*Serio v. Wachovia Sec., LLC*,
   2007 WL 2462626 (D.N.J. Aug. 27, 2007).........................................46

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Shearson/Am. Express, Inc. v. McMahon,*
  482 U.S. 220 (1987) ................................................................. 19, 41

*Stewart v. Nat'l Shopmen Pension Fund,*
  730 F.2d 1552 (D.C. Cir. 1984) .......................................................50

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
  130 S. Ct. 1758 (2010) ............................................................. 22, 23

*Suschil v. Ameriprise Fin. Servs., Inc.,*
  2008 WL 974045 (N.D. Ohio Apr. 7, 2008) .......................................33

*Sutherland v. Ernst & Young LLP,*
  _ F.3d _, 2013 WL 4033844 (2d Cir. Aug. 9, 2013).............................. 23, 50

*Tittle v. Enron Corp.,*
  463 F.3d 410 (5th Cir. 2006) ..........................................................39

*Tolbert v. RBC Cap. Mkts. Corp.,*
  No. 11-107 (S.D. Tex. Mar. 27, 2013) ...............................................46

*Uniroyal Chem. Co. v. Deltech Corp.,*
  160 F.3d 238 (5th Cir. 1998) ..........................................................31

*United Steelworkers of Am. v. Am. Mfg. Co.,*
  363 U.S. 564 (1960) .....................................................................43

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,*
  363 U.S. 574 (1960) .....................................................................21

*Volt Info. Scis., Inc. v. Bd. of Trs.,*
  489 U.S. 468 (1989) ................................................................ 21, 32

*Webb v. InvestaCorp, Inc.,*
  89 F.3d 252 (5th Cir. 1996) ...........................................................21

### Statutes

29 U.S.C. § 1002(2)(A)........................................................................45

29 U.S.C. § 1022(a) ..........................................................................12

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

29 U.S.C. § 1441(d) .................................................................................50

7 U.S.C. § 26(n)(2)...................................................................................41

9 U.S.C. § 16(a)(1)(B) ...............................................................................3

9 U.S.C. § 2 ....................................................................................... 2, 18

9 U.S.C. § 4 ...............................................................................................3

### Rules

FINRA Rule 13201(a)...............................................................................31

FINRA Rule 13201(b) ..............................................................................31

FINRA Rule 13204 ...................................................................................32

FINRA Rule 13204(a)(4) ..................................................................... 30, 31

### Regulations

29 C.F.R. § 2510.3-2(c) ...........................................................................46

## INTRODUCTION

In two separate agreements, each of the named plaintiffs promised to arbitrate any disputes with their former employer, UBS Financial Services Inc. ("UBSFS"), relating to compensation, benefits, or other employment matters. The first, called the Compensation Plan, was the principal agreement governing the various components of plaintiffs' compensation as financial advisors or branch managers. The second, called the PartnerPlus Plan, established a deferred compensation bonus arrangement as well as the circumstances in which unvested awards and credited interest would be forfeited upon termination of employment.

The annual Compensation Plans require arbitration of "any disputes" between plaintiffs and UBSFS, "including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment" (ROA 13-40693 2600); PartnerPlus requires arbitration of all disputes between plaintiffs and UBSFS involving deferred compensation (ROA 13-40693 2445). In the Compensation Plans, plaintiffs also expressly agreed not to "commence [or] be a party to" any class action relating to these same types of disputes. *Id*. at 2600.

Plaintiffs broke their promises to resolve any disputes with UBSFS related to compensation, benefits, or employment in individual arbitrations by initiating in federal court these putative nationwide class actions, in which they seek additional compensation in the form of unvested bonus awards.

UBSFS sought to hold plaintiffs to their agreements, and enforce the parties' bargains, by moving to compel arbitration pursuant to the Federal Arbitration Act ("FAA"). Notwithstanding the express arbitration provisions in both agreements, the magistrate judge denied UBSFS's motion and the district court confirmed that ruling. ROA 13-40693 892; ROA 13-40693 1984; ROA 13-40692 2000.

The district court's refusal to enforce valid arbitration provisions that unquestionably cover the parties' dispute is directly at odds with the FAA, which makes such agreements enforceable as a matter of federal law. 9 U.S.C. § 2. Time and again the Supreme Court has held that the FAA means what it says—an agreement to arbitrate must be honored by federal courts. *E.g.*, *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310–12 (2013); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011); *Preston v. Ferrer*, 552 U.S. 346, 352–53 (2008). Indeed, other courts have enforced the specific provisions of the UBSFS agreements that the court below refused to enforce in this case.

The path to reversal is short and straight: The agreements at issue contain arbitration provisions that indisputably cover plaintiffs' claims, and those provisions—as well as the complementary class waiver provision in the Compensation Plans—are enforceable as a matter of federal law. This Court should reverse the district court's erroneous denial of UBSFS's motion to compel arbitration, and order that this dispute be arbitrated pursuant to the terms of the parties' agreements.

## JURISDICTIONAL STATEMENT

The district court, which had jurisdiction over UBSFS's motion to compel arbitration under 9 U.S.C. § 4, entered an order denying UBSFS's motion for re-consideration of the magistrate judge's denial of its motion to compel arbitration on May 29, 2013.  ROA 13-40693 1984; ROA 13-40692 2000.  UBSFS timely noticed its appeals on June 24, 2013.  ROA 13-40693 2276; ROA 13-40692 2172.  This Court has jurisdiction over this appeal under 9 U.S.C. § 16(a)(1)(B).

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's denial of UBSFS's motion to compel arbitration.  *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 428–29 (5th Cir. 2004).

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

The named plaintiffs and UBSFS expressly agreed that any disputes regarding compensation, benefits, or other employment-related matters would be resolved through individual (non-class) arbitration.  Plaintiffs initiated a putative class action lawsuit seeking to recover unvested bonus awards that they forfeited upon going to work for a competitor.  The question presented is whether the district court erred in denying UBSFS's motion to compel arbitration.

## STATEMENT OF THE CASE

The named plaintiffs—Bill Hendricks, Aubrey Stacy, Mark Eddingston, Jeffery Davis, Elridge Bollich, and Ray Cox—filed complaints in the Eastern District of Texas on August 3, 2012, and September 19, 2012.  They sought to represent two classes of plaintiffs—one class of former financial advisors (*Eddingston et al. v. UBSFS*) and one class of former branch managers (*Hendricks et al. v. UBSFS*).  ROA 13-40693 30, 85; ROA 13-40692 26.  Plaintiffs in both cases press identical claims seeking to recover unvested awards credited to their PartnerPlus accounts that they forfeited when they left UBSFS to work for competitors.  ROA 13-40692 34–35; ROA 13-40693 95–96.

UBSFS moved to compel arbitration in each case on November 15, 2012.  ROA 13-40692 105; ROA 13-40693 148.  In a bench ruling, the magistrate judge denied UBSFS's motion to compel arbitration in both cases on February 4, 2013.  ROA 13-40693 971–73.  And on May 29, 2013, the district court denied reconsideration, concluding without further analysis that the magistrate judge's ruling was "neither clearly erroneous nor contrary to law."  ROA 13-40693 1984; ROA 13-40692 2000.  On June 24, 2013, UBSFS noticed its appeals from the district court's decisions in both cases.  ROA 13-40693 2276; ROA 13-40692 1272.  This Court granted UBSFS's motion to consolidate the two cases on July 5, 2013; and

on July 24, 2013, the Court denied UBSFS's motion for a stay of district court proceedings, but granted UBSFS's motion to expedite briefing and oral argument.

## STATEMENT OF FACTS

UBSFS is a nationwide financial services organization providing a full range of investment services to its retail and institutional clients, including investment advisory and brokerage services. As a broker-dealer, UBSFS is subject to federal and state regulatory schemes that are detailed, complex, and comprehensive. UBSFS's business operations are governed by various federal statutes, including the Securities Exchange Act of 1934, the Securities Act of 1933, the Investment Advisors Act of 1940, and the Government Securities Act of 1986, among many others. UBSFS is regulated by multiple federal agencies, including the Securities and Exchange Commission, the United States Treasury Department, and the Federal Reserve System. UBSFS is also subject to regulation by the principal self-regulatory organization for the financial services industry, the Financial Industry Regulatory Authority ("FINRA"), which was formerly known as the National Association of Securities Dealers ("NASD"), and to supervision by individual state securities authorities.

The named plaintiffs are sophisticated and highly compensated securities professionals who were previously employed by UBSFS. Messrs. Hendricks and Stacy (the named plaintiffs in *Hendricks*) were UBSFS branch managers, while

Messrs. Eddingston, Bollich, Davis, and Cox (the named plaintiffs in *Eddingston*) were licensed financial advisors. ROA 13-40692 27; ROA 13-40693 86. Although their compensation varied, in most years plaintiffs earned several hundred thousand dollars each. Mr. Eddingston, for example, received millions in compensation from UBSFS from 2000 through 2008. ROA 13-40693 2546–47. Plaintiffs' compensation was derived primarily from production-based commissions and special bonuses, and was governed by several detailed written plans.

1. The primary agreements governing plaintiffs' compensation were the annual Branch Manager Compensation Plan and the annual Financial Advisor Compensation Plan, which contained identical arbitration and class waiver provisions. ROA 13-40693 2600; ROA 13-40692 2668. Since 2007, the respective Branch Manager and Financial Advisor Compensation Plans informed recipients that "[t]he continuation of your employment after receipt of this plan and/or acceptance of benefits hereunder shall be deemed your consent to its terms." ROA 13-40693 2601; ROA 13-40692 2669. Each of the named plaintiffs signed one or more acknowledgments that they had received the Compensation Plans, that it was their

6

responsibility to read the Plans, and that they agreed to be bound by their terms.

ROA 13-40693 2498, 2501, 2503, 2505; ROA 13-40692 2674–76, 2684–89.[1]

Under the bolded heading "Arbitration," the 2008 version of the Compensa-

tion Plan states:

> With the exception of claims for injunctive relief or the denial of ben-
> efits under the firm's disability or medical plans, you and UBS agree
> that, unless prohibited by applicable law, *any disputes* between you
> and UBS *including claims concerning compensation, benefits* or other
> terms or conditions of employment and termination of employ-
> ment . . . whether they arise by statute or otherwise, including but not
> limited to, claims arising under . . . The Employee Retirement Income
> Security Act . . . or any other federal, state or local employ-
> ment . . . laws, *will be determined by arbitration* as authorized and
> governed by the arbitration law of the state of New Jersey.  Any such
> arbitration will be conducted under the auspices and rules of the Fi-
> nancial Industry Regulatory Authority ("FINRA") . . . .  Subject to the
> parties' right to appeal or seek vacatur under applicable law, you and
> UBS agree that the decision of the Arbitrator(s) will be final and bind-
> ing on the parties and that the Arbitrator(s) is authorized to award
> whatever remedies would be available to the parties in a court of law.

---

[1] The named plaintiffs in *Eddingston* signed acknowledgements at the end of the
annual Financial Advisor Compensation Plans (ROA 13-40693 2498, 2501,
2503, 2505), whereas the named plaintiffs in *Hendricks* signed Letters of Un-
derstanding in which they affirmed that they "have read, understand and agree
to" the Branch Manager Compensation Plan, as well as the Letter of Under-
standing itself (ROA 13-40692 2674–76, 2684–89).  The Letters of Understand-
ing also contained a substantially identical arbitration provision to that set out in
the Branch Manager Compensation Plans.  ROA 13-40692 2674–76, 2684–89.
As each of the named plaintiffs thus agreed to be bound by the terms of their re-
spective Compensation Plans, for simplicity this brief will refer primarily to the
Compensation Plans' arbitration provision and class waiver alone, not also to
the separate Branch Manager Letters of Understanding.  Similarly, this brief
will refer collectively to the "Compensation Plans" instead of to the separate
Financial Advisor and Branch Manager Compensation Plans as the agreements
contain identical arbitration provisions and class waivers.

You and UBS further agree that any disputes between you and UBS shall be heard, as set forth above, by FINRA . . . without consolidation of such claims with any other person or entity. By agreeing to the terms of this Compensation Plan to the fullest extent permitted by law, *you waive any right to commence, be a party to or an actual or putative class member of any class or collective action* arising out of or relating to your employment with UBS or the termination of your employment with UBS.

ROA 13-40693 2488 (emphasis added). The Compensation Plans for 2007 and 2009 (the other two years relevant to plaintiffs' claims) each include an essentially identical arbitration agreement and class action waiver. ROA 13-40693 2600; ROA 13-40692 2668.

As the primary document governing plaintiffs' employment relationship with UBSFS, the Compensation Plans establish the principal elements of plaintiffs' compensation and address length of service and other policies, service and merits awards, and various financial programs that UBSFS made available to plaintiffs during their employment. The financial advisors' 2008 Compensation Plan, for example, contains nine separate substantive sections:

- Production-Related Payout
- Asset and Credit Line Growth Award
- Recognition Councils
- Productivity and UBS Length of Service Awards
- *UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan*
- Expense Allowance Programs
- Length of Service Policy

- Arbitration
- Conclusion

ROA 13-40693 2462 (emphasis added).

The arbitration and class waiver provisions are set out under a separate section heading near the end of the Compensation Plans, after the Plans' descriptions of these various policies and programs, and expressly apply to *all* compensation-related disputes.  ROA 13-40693 2600.

2.  One of the bonus programs described in the Compensation Plans is the PartnerPlus Plan, which was designed to "retain and motivate" employees by "providing enhanced financial awards" for employees who met certain eligibility requirements, and by "permitting the voluntary deferral of Compensation for a fixed period of years."  ROA 13-40693 2426.  The full PartnerPlus Plan (ROA 13-40693 2426–49) is summarized in the Compensation Plans for financial advisors under the separate heading, "UBS PartnerPlus/UBS Financial Advisor Deferred Award Plan," and in the Compensation Plans for Branch Managers under the heading "UBS PartnerPlus Plan for Branch Managers."  ROA 13-40693 2593–96; ROA 13-40692 2665–67.  All of the named plaintiffs became participants in PartnerPlus between 1995 (at the earliest) and 2001 (at the latest).  ROA 13-40693 2509–14, 2516–18, 2520–24, 2526–29, 2531–34.

The contributions made by plaintiffs and UBSFS to PartnerPlus were credited with "turbo interest"—up to 24 percent in some years—for the first four years

after contributions to the plan, and a market interest rate thereafter. ROA 13-40693 2432–33. The firm contributions and any interest credited began vesting in the sixth year following the award grant at 20 percent per year until fully vested at the end of ten years. Employee contributions vested immediately. ROA 13-40693 2432–33. At the ten-year mark, participants were *required* to take an "in-service" distribution equal to the initial contribution plus all vested interest. ROA 13-40693 2436–37. Most plaintiffs received hundreds of thousands of dollars in distributions from PartnerPlus during their employment with UBSFS. ROA 13-40693 2509–14, 2516–18, 2520–24, 2526–29, 2531–34, 2548.

In accordance with PartnerPlus's stated purpose of fostering employee reten-tion, unvested contributions by UBSFS, as well as unvested credited interest, were forfeited if participants left UBSFS before meeting certain age and service re-quirements or if they decided to work for a competitor. ROA 13-40693 2437–39. As a result, when the named plaintiffs left UBSFS to work for competitors, each of them forfeited the unvested awards and interest. (They often received offsetting signing bonuses from their new employers—for example, Eddingston received a substantial signing bonus to join Morgan Stanley that was about five times greater than the amount that he forfeited when he left UBSFS. ROA 13-40693 2542, 2550–51.) Some of the departing members of the putative classes signed releases in which they agreed to forgo "any and all claims" against UBSFS, including those

related to "compensation" and the "forfeiture of . . . deferred cash awards," as well as "other benefits." ROA 13-40693 2404–05, 2407–13, 1416–21.

Since its inception, PartnerPlus has contained an arbitration clause providing that "any dispute, claim or controversy involving a Participant . . . and the Plan . . . arising out of the Plan and a Sponsor . . . shall be resolved before [a FINRA] arbitration panel in accordance with the arbitration rules of [FINRA]." ROA 13-40693 2445.

3.  In 2012, plaintiffs brought two separate lawsuits in the Eastern District of Texas, a jurisdiction with which they have no connection, seeking to recover the amounts they forfeited when they decided to leave UBSFS to work for a competitor. ROA 13-40692 26–37; ROA 13-40693 85–99. Plaintiffs claim that PartnerPlus is not a deferred compensation plan intended to "retain and motivate" eligible employees as the plan documents expressly state. ROA 13-40693 2426. Instead, plaintiffs assert that PartnerPlus is an employee *retirement* plan governed by ERISA, even though the applicable versions of PartnerPlus expressly state that it is *not* an ERISA-governed plan. ROA 13-40692 27–28; ROA 13-40693 87, 1009, 1012, 2426. Plaintiffs allege that the vesting and forfeiture provisions of Partner-Plus violate ERISA.[2] ROA 13-40692 29–30; ROA 13-40693 89–90.

---

[2] Plaintiffs in *Eddingston* also allege in the alternative that the forfeiture provision of PartnerPlus violates Texas state law. ROA 13-40693 95. At the class-

UBSFS moved to compel arbitration on November 15, 2012. ROA 13-40692 105; ROA 13-40693 147. UBSFS argued that the PartnerPlus and Compensation Plans' arbitration provisions, as well as the Compensation Plans' class waiver, were valid and clearly covered the claims at issue, and that they should therefore be enforced according to their terms. ROA 13-40692 121–29; ROA 13-40693 164–72.

The magistrate judge denied UBSFS's motion. He did not find that the Compensation Plans were invalid; rather, he concluded that the PartnerPlus Plan's arbitration agreement controlled and did not allow for class action arbitration under FINRA arbitration rules:

> [B]eing mindful of the policy of the Federal Arbitration Act in favor of arbitration, that only where the terms of the arbitration clause call for it, I find that the arbitration clause in the PartnerPlus Plan clearly does not extend to arbitration of class claims. I further find that the language of the FINRA rule [13204], which has language accepting class claims where the member elects not to participate, does not apply here. Pre-suit waiver clause, such as that relied upon in the Financial Advisor Compensation Plan does not fall within the language of that FINRA rule which contemplates election not to participate in or withdrawal from a pending certified or putative class action claim. Therefore, I find that the PartnerPlus arbitration clause does not provide for arbitration of the claims that the Plaintiffs are making in this case.

ROA 13-40693 971–72 (emphasis added). As to the class waiver provision in the Compensation Plans, the magistrate judge disregarded it because, he concluded, it

---

certification hearing, however, plaintiffs withdrew their attempt to have the state law claims certified. ROA 13-40693 2263.

constituted an "amendment" to PartnerPlus that did not comport with the procedures for amending an ERISA plan (29 U.S.C. § 1022(a)):

> The Court will accept the PartnerPlus Plan as a covered ERISA plan at this time, based upon the allegations of the complaint and the first amended complaint and also based on the fact that it appears, based on a reading of those plans, to meet the definition of a pension plan or a deferred compensation plan that would be covered by ERISA. Whether or not it actually is such a plan is a matter that will have to be determined at a later date. But because the Court accepts it as such at this time, as I believe the Court has to on this record, the separate arbitration agreement in the Financial Advisor Compensation Plan will not be allowed to modify the arbitration clause in the PartnerPlus Plan under ERISA. And to give it the effect that the Defendant, UBS, is arguing for in this case would be to modify that plan.

ROA 13-40693 972.

UBSFS sought review by the district court. ROA 13-40693 1005. On May 29, 2013, the district court denied UBSFS's motion for reconsideration, approving the magistrate judge's order without further analysis. ROA 13-40693 1984; ROA 13-40692 2000. The court also denied UBSFS's motion for a stay, and proceedings continued in the district court. ROA 13-40693 1984; ROA 13-40692 2000. On June 12, the magistrate judge entered a report and recommendation in which he concluded that a class should be certified in each case on the ERISA claim. ROA 13-40693 2105. UBSFS has filed objections (ROA 13-40693 2279), and the district court has not yet ruled on class certification.

On June 24, UBSFS appealed the district court's denial of its motion to compel arbitration in both cases to this Court, seeking reversal and an order direct-

ing plaintiffs to bring their claims in bilateral arbitration proceedings. ROA 13-40693 2276; ROA 13-40692 2172. This Court consolidated and expedited the appeals.

## SUMMARY OF ARGUMENT

**I.** The arbitration provisions of the Compensation Plans and PartnerPlus, as well as the Compensation Plans' complementary class waiver clause, are valid and cover plaintiffs' compensation-based disputes with UBSFS. Therefore, they should have been enforced by the district court.

**A.** A court's authority when resolving a motion to compel is limited to just two gateway questions: whether the parties agreed to a valid arbitration provision, and whether that provision covers the claims at issue. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2856 (2010). The same rule applies to class waiver agreements. *See*, *e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2312 (2013).

**B.** The Compensation Plans and PartnerPlus agreements are valid and reach plaintiffs' claims against UBSFS. Plaintiffs have not argued that the arbitration provisions were insufficiently supported by consideration or otherwise invalid under state contract law. Moreover, the "any dispute" language in the arbitration provisions of both the Compensation Plans and PartnerPlus clearly includes claims for unvested deferred compensation awards that plaintiffs forfeited upon leaving

UBSFS to work for competitors.  The only proper focus of judicial inquiry was thus undisputed and the matter should have been promptly referred to arbitration.

**II.** The magistrate judge exceeded the proper judicial role, and erred as a matter of law, in concluding that arbitration of this compensation-related dispute would somehow be inconsistent with either FINRA rules or ERISA.

**A.** The Compensation Plans and PartnerPlus specify that the arbitration shall be conducted pursuant to FINRA's procedural rules.  FINRA Rule 13204 generally precludes arbitration of class claims, but states that it does not apply to parties who "elect[] not to participate in the class" *and* that it "do[es] not otherwise affect the enforceability of any rights under the Code or any other agreement."  By agreeing to the Compensation Plans' class waiver, each of the named plaintiffs agreed not to participate in class proceedings related to their disputes with UBSFS, and thus contractually opted out of the "default" FINRA rule.  There is no conflict between the class waiver and the arbitration provision in either the Compensation Plans or PartnerPlus—those provisions, read together, establish that plaintiffs elected to arbitrate all claims and to preclude the use of class adjudication.  Those agreements are enforceable under the FAA, and FINRA rules do not implement any clear congressional command to override the mandate of the FAA. *See CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012).

**B.** The magistrate judge erred by rejecting the Compensation Plans' class waiver provision as an improper "amendment" of PartnerPlus under ERISA. As an initial matter, the question whether PartnerPlus is an ERISA plan lies at the very heart of the parties' dispute—it should not have been addressed by the lower court; or, at minimum, any doubts should have been resolved *in favor* of arbitration. In all events, as a retention program designed to incentivize employees through deferred compensation, PartnerPlus is not an ERISA plan. And ERISA's amendment provision cannot override the parties' agreement to resolve these disputes through individual arbitrations. *See CompuCredit*, 132 S. Ct. at 669.

## ARGUMENT

In exchange for lucrative compensation arrangements, the named plaintiffs agreed in both the Compensation Plans and PartnerPlus agreements to arbitrate *any* disputes with UBSFS, and further promised (in the Compensation Plans) not to bring or participate in a class action involving employment-related disputes. Plaintiffs have failed to honor all three promises by initiating this lawsuit, resisting arbitration, and seeking class certification in federal court.

The district court improperly remade the parties' bargain by allowing plaintiffs to proceed in court rather than through individual arbitrations. This Court should hold plaintiffs to the agreements they voluntarily made in exchange for the hundreds of thousands of dollars in compensation and bonuses UBSFS awarded to

them during their employment by reversing the order under review and directing the parties to arbitration.

The arbitration and class waiver provisions are valid and plainly cover the claims plaintiffs press in this case.  These undisputed facts should have led the district court to compel arbitration because the FAA makes such agreements enforceable in federal court—period.  The district court's refusal to enforce those agreements in reliance on FINRA rules and ERISA's amendment provision was trebly erroneous.  The court never should have construed the FINRA rules or determined whether or not PartnerPlus was governed by ERISA; once it did, the court incorrectly construed the applicable FINRA rule and improperly assumed that PartnerPlus was an ERISA plan in order to hold that the class waiver provision in the Compensation Plans constituted an improper amendment provision of ERISA; and in any event, neither FINRA's rules nor ERISA's amendment provision, however construed, can render these arbitration agreements unenforceable.

## I.  The Named Plaintiffs Agreed To Valid Arbitration And Class Waiver Provisions That Cover This Dispute

Consistent with the strong federal policy in favor of arbitration reflected in the FAA, courts have a very limited role when deciding a motion to compel arbitration.  Courts must determine only whether the arbitration clause at issue is a valid agreement between the parties and whether, on its face, that clause covers the issues in dispute.  These principles hold where, as here, the parties also include a

17

class waiver as part of their arbitration agreement.  It is undisputed that the Part-

nerPlus and Compensation Plan agreements are valid and that their arbitration and

class waiver provisions cover plaintiffs' compensation-related disputes with

UBSFS.  No more was (or is) required to compel arbitration here, and the district

court erred in going any further.

### A.    The Federal Arbitration Act Authorizes Only A Limited Judicial Inquiry On A Motion To Compel Arbitration

Section 2 of the FAA states that "[a] written provision in any … contract ev-

idencing a transaction involving commerce to settle by arbitration a controversy

thereafter arising out of such contract or transaction … shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revoca-

tion of any contract."  9 U.S.C. § 2.  This clear text mandates that a bargained-for

arbitration agreement must be enforced by federal courts so long as the agreement

is "susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs.,*

*Inc. v. CWA*, 475 U.S. 643, 650 (1986) (internal quotation marks omitted).

As the Supreme Court reaffirmed in *AT&T Mobility LLC v. Concepcion*, 131

S. Ct. 1740 (2011), this exacting standard is necessary to implement the "liberal

federal policy favoring arbitration" expressed by the FAA.  *Id.* at 1745 (internal

quotation marks omitted); *see also Perry v. Thomas*, 482 U.S. 483 (1987).  Indeed,

the "overarching purpose" of the FAA is "to ensure the enforcement of arbitration

agreements according to their terms so as to facilitate streamlined proceedings"

(*Concepcion*, 131 S. Ct. at 1748), in order to "'revers[e] centuries of judicial hostility to arbitration agreements'" (*Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 225 (1987) (alteration in original) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 (1974))). The Court reiterated this most recently in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), stating that invalidating class waivers would "sacrifice[] the principal advantage of arbitration—its informality"—by "mak[ing] the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 2312 (internal quotation marks omitted).

For more than two decades, the Supreme Court has repeatedly ruled that "courts must 'rigorously enforce' arbitration agreements according to their terms," including in cases alleging violation of a federal statute. *Id.* at 2309 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see also*, *e.g.*, *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983); *BP Exploration Libya Ltd. v. ExxonMobil Libya Ltd.*, 689 F.3d 481, 490 (5th Cir. 2012); *McKee v. Home Buyers Warranty Corp. II*, 45 F.3d 981, 983 (5th Cir. 1995). The only exception is where there is a clear "congressional command" prohibiting arbitration (*CompuCredit*, 132 S. Ct. at 669 (internal quotations omitted))—something plaintiffs here have never asserted, because there is no such command in this case.

1. In keeping with the FAA's strict mandate, the authority of a court resolving a motion to compel arbitration extends only to gatekeeping questions of arbitrability: "[T]he court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2856 (2010); *see also*, *e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 130 S. Ct. 2772, 2778 (2010). A district court's inquiry is thus limited to resolving just two questions: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 392 (5th Cir. 2002) (internal quotation marks omitted).

Once a court has answered both of these questions in the affirmative, it has no discretion to decide *whether* to enforce a valid arbitration agreement. Courts are "*require[d]* to enforce agreements to arbitrate according to their terms" (*CompuCredit*, 132 S. Ct. at 669 (emphasis added)); and the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218.

Moreover, courts must resolve *any* ambiguity regarding whether an arbitration agreement is valid or covers the claims at issue in favor of arbitration. *Moses*

*H. Cone*, 460 U.S. at 24–25 ("as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 476 (1989) ("due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration"); *Webb v. InvestaCorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) ("ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration") (citing *Volt Info. Scis.*, 489 U.S. at 475–76). This interpretative principle reflects the "'healthy regard for the federal policy favoring arbitration'" courts must show (*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (quoting *Moses H. Cone*, 460 U.S. at 24)), and is consistent with the settled rule that "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). As a result, "only the most forceful evidence of a purpose to exclude the claim from arbitration can" defeat a motion to compel arbitration. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585 (1960); *see also CompuCredit*, 132 S. Ct. at 669.

Indeed, a court may deny a motion to compel arbitration only if the party resisting the motion provides "*positive assurance* that the arbitration clause is *not susceptible* of an interpretation that covers the asserted dispute." *AT&T Techs.*, 475 U.S. at 650 (emphasis added) (internal quotation marks omitted); *see also*,

21

*e.g.*, *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local No. 4-2001 v. ExxonMobil Ref. & Supply Co.*, 449 F.3d 616, 620 (5th Cir. 2006) (presumption in favor of arbitration only rebutted by "the 'most forceful evidence' of a purpose to exclude the claim from arbitration") (quoting *CWA v. Sw. Bell Tel. Co.*, 415 F.2d 35, 39 (5th Cir. 1969)); *Fedmet Corp. v. M/V Buyalyk*, 194 F.3d 674, 676 (5th Cir. 1999) (any "doubts as to the availability of arbitration must be resolved in favor of arbitration") (internal quotation marks omitted).

2. All of the foregoing principles apply equally to class waiver provisions. It is "clear" from Supreme Court "precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1774 (2010); *see also*, *e.g.*, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("arbitration is simply a matter of contract *between the parties*; it is a way to resolve those disputes … that the *parties* have agreed to submit to arbitration") (emphasis added). As a result, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen*, 130 S. Ct. at 1775; *see also Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 451 (2003) (plurality opinion).

In both *Concepcion*, 131 S. Ct. at 1748, and *Italian Colors*, 133 S. Ct. at 2312, the Supreme Court has upheld arbitration provisions containing class waiv-

ers based on the same "foundational FAA principle" that "arbitration is a matter of consent." *Stolt-Nielsen*, 130 S. Ct. at 1775. Indeed, class waivers are fully enforceable even if the effect of such a waiver, as a practical matter, denies a party the ability to bring a claim *at all* because of the prohibitive expense of individual arbitrations compared to class proceedings. *Italian Colors*, 133 S. Ct. at 2312 ("specifically reject[ing] the argument" that a class waiver might render an arbitration clause invalid even when "class arbitration was necessary to prosecute claims 'that might otherwise slip through the legal system'") (quoting *Concepcion*, 131 S. Ct. at 1753); *see also Sutherland v. Ernst & Young LLP*, _ F.3d _, 2013 WL 4033844, at *6 (2d Cir. Aug. 9, 2013) (enforcing class waiver because, under *Italian Colors*, "the 'effective vindication doctrine' cannot be used to invalidate class-action waiver provisions in circumstances where the recovery sought is exceeded by the costs of individual arbitration"); *Raniere v. Citigroup Inc.*, No. 11-5213, 2013 WL 4046278, at *2–3 (2d Cir. Aug. 12, 2013) (same). In any event, this concern is not present here given the substantial amounts of forfeited deferred compensation that each named plaintiff seeks to recover. *See* ROA 13-40693 2542–43, 2550–51; *see also, e.g., Lewis v. UBS Fin. Servs. Inc.*, 818 F. Supp. 2d 1161, 1168 (N.D. Cal. 2011) (former UBSFS financial advisors raising claims similar to plaintiffs' could "effectively assert their rights in individual arbitration, particularly given the amounts at stake").

3. The Supreme Court's unbroken string of decisions enforcing arbitration provisions *and* class waivers reflects its recognition that the whole "point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute[,] . . . reducing the cost and increasing the speed of dispute resolution." *Concepcion*, 131 S. Ct. at 1749; *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 257 (2009) ("Parties generally favor arbitration precisely because of the economics of dispute resolution"); *Preston v. Ferrer*, 552 U.S. 346, 357–58 (2008) ("A prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results'") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633 (1985)).

For this reason, initial merits or evidentiary inquiries—"preliminary litigating hurdle[s]," in the words of the Supreme Court (*Italian Colors*, 133 S. Ct. at 2312)—have no place in the limited juridical inquiry the FAA allows.

**B.** **The Arbitration And Class Waiver Agreements Are Enforceable**

Under the foregoing legal standards, the arbitration agreements in Partner-Plus and the Compensation Plans, as well as the Compensation Plans' class waiver, should have been enforced according to their terms. Plaintiffs do not dispute that these arbitration provisions are valid agreements between the parties, or that these provisions cover the issues in dispute. Nor could they: There is no basis in this

record for invalidating the arbitration provisions in either the Compensation Plans or PartnerPlus, and those respective arbitration provisions unquestionably cover the claims at issue. The Compensation Plans state that "*any* dispute[]" with UBSFS must be resolved through arbitration, "including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment" (ROA 13-40693 2600), and the comparable PartnerPlus provision applies to "any dispute, claim or controversy . . . arising out of the Plan" (ROA 13-40693 2445). These *undisputed* facts are alone sufficient to reverse the district court's refusal to refer this matter to arbitration. *See, e.g., Italian Colors*, 133 S. Ct. at 2312; *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002); *Pers. Sec. & Safety Sys.*, 297 F.3d at 392.

1. Both the Compensation Plans and PartnerPlus are valid agreements between the parties. The judicial inquiry is limited to the question whether the agreements themselves are valid under applicable principles of contract law. *Howsam*, 537 U.S. at 84 (citing *First Options of Chi.*, 514 U.S. 938; *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47 (1964)); *see also Baldwin v. Cavett*, 502 F. App'x 350, 353 (5th Cir. 2012) (per curiam) (arbitration agreement valid if the "elements compris[ing] contract formation[,] . . . offer, acceptance, and a 'meeting of the minds'" are met).

Plaintiffs have not raised any such challenge to the agreements containing the arbitration provisions in this case.  And it is hard to imagine how they could: Plaintiffs are sophisticated financial professionals who were compensated to the tune of hundreds of thousands of dollars each year they were employed by UBSFS. There is no suggestion that they were coerced or defrauded into agreeing to the Compensation Plans or PartnerPlus.  *Cf. Gilmer*, 500 U.S. at 33.  On the contrary, plaintiffs agreed to the terms of these plans—including their arbitration and class waiver provisions—in order to secure the substantial compensation that they subsequently received, including distribution of vested PartnerPlus awards.  One of the *quid pro quos* for that lucrative compensation was plaintiffs' agreement to resolve any disputes through individual arbitrations.

2.  The arbitration provisions of both the Compensation Plans and PartnerPlus plainly cover plaintiffs' claims, as does the Compensation Plans' class waiver agreement.  Plaintiffs allege generally that the events in question arose from their employment at and voluntary resignation from UBSFS, and they seek to recover "Firm Contribution, Market Interest and Turbo Interest" that plaintiffs claim is due them under PartnerPlus.  ROA 13-40693 33, 39–44, 88, 94–97.  These claims are encompassed by the express terms of both PartnerPlus and the Compensation Plans.

The Compensation Plans cover "any disputes," "including claims concerning compensation, benefits or other terms or conditions of employment and termination of employment," expressly including "claims arising under … The Employee Retirement Income Security Act." ROA 13-40693 2600. Plaintiffs' claims track this language almost exactly: They seek to recover "compensation" that they forfeited upon "termination of employment," asserting ERISA as the basis for their claims. The same is true of PartnerPlus, which covers "any dispute, claim or controversy involving a Participant … arising out of the Plan." ROA 13-40693 2445. Plaintiffs' claims to recover unvested deferred compensation awards from PartnerPlus fall squarely within this provision. The arbitration provisions and class waiver were designed to cover the precise claims that plaintiffs press in this case.

If there were any doubt or ambiguity regarding the applicability of the arbitration clauses and class waiver (there is not), the district court was required to resolve that doubt in *favor* of arbitration. *See Moses H. Cone*, 460 U.S. at 24–25. Thus, even if plaintiffs could provide some construction of the agreements that would avoid arbitration, that would not amount to the requisite "positive assurance" that the Compensation Plans' arbitration clause and class waiver are "not susceptible" of any interpretation favoring arbitration. *AT&T Techs.*, 475 U.S. at 650. The district court should have ordered the named plaintiffs to bring their

claims in individual arbitrations according to the plain terms of their voluntary agreements.

3.   The district court's authority at this stage extended no further than to determining whether the agreements between plaintiffs and UBSFS are valid and cover the dispute.   Because these questions were not truly disputed by plaintiffs, the district court should have compelled arbitration.   Instead, in allowing plaintiffs to avoid their own agreements to arbitrate claims individually, the district court interposed precisely the kind of "preliminary litigating hurdle[s]" that the Supreme Court recently, and forcefully, reiterated are foreclosed by the FAA.   *Italian Colors*, 133 S. Ct. at 2312.   The court never should have reached those issues; and it resolved them incorrectly, as UBSFS explains next.

## II.   The District Court Erred In Refusing To Enforce The Arbitration And Class Waiver Agreements

In venturing beyond its authority to consider the impact of FINRA rules and ERISA's amendment procedures, the lower court erred in its construction of both the relevant FINRA rule and ERISA; and in any event, neither FINRA rules nor ERISA's amendment provision can render unenforceable the parties' agreement to arbitrate.

### A.   FINRA Rules Do Not Preclude Arbitration Here

Plaintiffs do not deny—nor could they—that the two agreements at issue contain arbitration clauses and a class waiver; rather, they argue that they do not

have to abide by those agreements because a FINRA rule does not permit class claims to be arbitrated. The magistrate judge accepted plaintiffs' argument that FINRA Rule 13204 exempts class claims from mandatory arbitration provisions, and thus UBSFS cannot compel arbitration under the Compensation Plans or Part-nerPlus because plaintiffs have brought their disputes against UBSFS on behalf of putative classes. ROA 13-40693 971–72.

Plaintiffs' "class" arbitration point is answered entirely by the Compensation Plans' class waiver provision, which sets forth the parties' understanding and agreement that all covered disputes would be resolved *individually*. Under the FINRA rules, the parties were permitted to—and did—address by written agree-ment the interplay between collective adjudication and arbitration, agreeing in ad-vance that all disputes would be resolved through individual arbitrations and not class actions. This provision of the Compensation Plans totally undermines plain-tiffs' efforts to avoid their agreement to arbitrate.

Plaintiffs are thus forced to challenge the applicability of the class waiver; but interpretative questions including "what *kind of arbitration proceeding[s]* the parties agreed to . . . concern[] neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties," and thus are not legit-imate questions for a court to resolve on a motion to compel arbitration. *Green*

*Tree*, 539 U.S. at 451–52 (plurality opinion); *cf. Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012).

1. PartnerPlus is itself silent about the effect its arbitration clause has on collective actions or class claims. It states simply that "any dispute, claim or controversy involving a Participant . . . arising out of the Plan and a Sponsor" shall be submitted to arbitration, and requires that such disputes "shall be resolved before a [FINRA] arbitration panel in accordance with the arbitration rules of [FINRA]." ROA 13-40693 2445. One of the FINRA rules incorporated by this agreement, however, states that a party "may not enforce any arbitration agreement against a member of a certified or putative class action with respect to any claim that is the subject of the certified or putative class action." FINRA Rule 13204(a)(4).

Plaintiffs argued, and the magistrate judge agreed, that PartnerPlus's incorporation of FINRA Rule 13204 meant that it "clearly does not extend to arbitration of class claims." ROA 13-40693 971. Yet, the magistrate judge also noted that this rule does not apply if a party agrees not to participate in class actions (ROA 13-40693 971–72), referencing the last clause of Rule 13204(a)(4), which states that the class waiver rule does not extend to cases in which "[t]he member of the certified or putative class elects not to participate in the class." FINRA Rule 13204(a)(4). Nevertheless, the magistrate judge ultimately concluded—without further explanation—that "[p]re-suit waiver clause[s], such as that relied upon in

30

the Financial Advisor Compensation Plan d[o] not fall within the language" of this exception, and denied UBSFS's motion to compel arbitration on that basis. ROA 13-40693 791–92.

The FINRA rules do not support the magistrate judge's distinction between pre- and post-dispute class waivers. Rule 13204(a)(4) requires only that a member of a putative class "elect[] not to participate in the class"; it says nothing about the *timing* of that election. In contrast, another section of the FINRA code clearly distinguishes between pre- and post-dispute agreements, and requires the latter only in limited circumstances. *See* FINRA Rule 13201(b) ("A dispute arising under a whistleblower statute that prohibits the use of predispute arbitration agreements is not required to be arbitrated under the Code. Such a dispute may be arbitrated only if the parties have agreed to arbitrate it after the dispute arose."). Where, as here, drafters "include[] particular language in one … provision, and exclude[] it in another," courts generally assume they "did so intentionally." *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 244 n.9 (5th Cir. 1998).

Other courts considering the interplay between Rule 13204 and parties' class waivers—including the very class waiver at issue in this case—have not artificially distinguished between pre- and post-dispute agreements as the magistrate judge did here. *See LaVoice v. UBS Fin. Servs., Inc.*, 2012 WL 124590, at *6 (S.D.N.Y. Jan. 13, 2012) (finding class waiver in separate, pre-dispute agreement enforceable);

*Lewis*, 818 F. Supp. 2d at 1166–68 (same).  Indeed, one court examining the same Compensation Plan class waiver at issue in this case recognized that the language of the rule expressly contemplates the existence—and enforceability—of pre-dispute class waivers:  "Rule 13204(a) specifically speaks to the possibility that a 'member of the certified or putative class elects not to participate in the class.'"  *Cohen v. UBS Fin. Servs., Inc.*, 2012 WL 6041634, at *3 (S.D.N.Y. Dec. 4, 2012).

The magistrate judge thus correctly recognized that FINRA's default rule against arbitrating class claims has no relevance when parties expressly agree not to participate in class actions, but erred by failing to give effect to such an agreement simply because it was signed before plaintiffs filed their putative class claims.  Correcting this unfounded assumption makes clear—on the magistrate judge's own analysis—that the FINRA rules do not provide a basis for refusing to compel individual arbitrations of plaintiffs' disputes with UBSFS.

2.  Furthermore, the magistrate judge ignored the final, "savings clause" of Rule 13204, which states that the Rule "do[es] not otherwise affect the enforceability of any rights under the Code *or in any other agreement*."  FINRA Rule 13204 (emphasis added).  Thus, even if UBSFS could not compel arbitration of class claims under PartnerPlus alone, the terms of PartnerPlus expressly allow UBSFS to enforce another agreement modifying this default rule.  *See, e.g.*, *Volt Info. Scis.*, 489 U.S. at 479 (parties may "specify by contract the rules under

32

which . . . arbitration will be conducted," and it is "the FAA's primary purpose" to ensure that arbitration agreements are "enforced according to [these] terms").

The Compensation Plans' class waiver is just such an "other agreement." As discussed above, there is no dispute that the broad terms of the Compensation Plans' arbitration clause and class waiver extend to plaintiffs' claims. Arbitration clauses need not follow any formal structure or formatting rules to be valid under the FAA. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996). And for purposes of FINRA Rule 13204 specifically, "two separate, discrete, independent promises assented to by both contracting parties," namely, "to arbitrate [the parties'] Claims *and* … to forego [sic] their class action remedies," fall within the savings clause's "other agreement" exception, even when those promises are contained in the same document, as is the case with the Compensation Plans. *Suschil v. Ameriprise Fin. Servs., Inc.*, 2008 WL 974045, at *6 (N.D. Ohio Apr. 7, 2008).

Courts addressing the same situation here—a voluntary class waiver provision consistent with Rule 13204—have consistently recognized that FINRA's rules do not absolve parties from their duty to abide by that agreement according to its terms. Indeed, several courts have enforced the exact same UBSFS Compensation Plan class waiver that plaintiffs signed. In *Cohen*, 2012 WL 6041634, at *3, for example, the court enforced the class waiver, rejecting plaintiffs' "selective reading of the [FINRA] Code" and holding instead that Rule 13204 "recognizes that

33

parties may choose to enter into additional agreements beyond the scope of" that rule. *See also LaVoice*, 2012 WL 124590, at *6 (finding the same arbitration agreement and class waiver provision in UBSFS Compensation Plan to be enforceable and compelling individual arbitrations); *Lewis*, 818 F. Supp. 2d at 1166–68 (same). These decisions show that this is a plausible interpretation of the FINRA rule, and (unlike the construction adopted by the court below) conforms to the dictates of the FAA.

Plaintiffs have previously relied on two cases that speak to an entirely different situation: *In re Citigroup, Inc.*, 376 F.3d 23, 25 (1st Cir. 2004), and *Nielsen v. Piper, Jaffray & Hopwood, Inc.*, 66 F.3d 145, 147–48 (7th Cir. 1995). The courts in those cases considered whether a predecessor to FINRA Rule 13204 allowed a party to *compel* class arbitration, and concluded that it did not. But UBSFS does not seek to compel class arbitration; rather, it asks this Court to hold the named plaintiffs to their agreements to arbitrate claims individually. Neither *Citigroup* nor *Nielsen* involved arbitration agreements with a class waiver, as is true here. Those cases therefore say nothing about whether parties may agree *to forgo* any class-based resolution of their disputes, as plaintiffs and UBSFS did. And the Supreme Court has since held that class waivers are enforceable under the FAA. *Italian Colors*, 133 S. Ct. at 2312; *Concepcion*, 131 S. Ct. at 1748.

3. In this Court (in response to UBSFS's motion for a stay pending appeal), plaintiffs advanced the argument, which was not accepted by the court below, that the Compensation Plans are mere "summary brochures," not valid, stand-alone agreements, and that the class waiver provision "conflicts" with PartnerPlus and thus cannot be enforced against them. This argument misconceives the relationship between the Compensation Plans and PartnerPlus, and unsuccessfully attempts to conjure a conflict that has no basis in the text of the arbitration provisions of either plan. To embrace plaintiffs' argument would require this Court to depart from its limited role of determining the validity and scope of the parties' agreements, resolving all ambiguities in favor of arbitration, and reading the agreements in harmony unless there is "positive assurance" that they are "not susceptible" of a reading consistent with arbitration.

Although each of the Compensation Plans contain a summary of Partner-Plus, that discussion is limited to just one section within the document, and the arbitration agreement and class waivers are *not* part of that section. ROA 13-40693 2593–96, 2600. The magistrate judge recognized as much at the arbitration hearing, rejecting plaintiffs' "summary brochure" argument out of hand:

> [I]n view of the larger [Compensation Plan] agreement, the more complete copy of that that's been made available to me now, it does not look like that arbitration clause at the end of that and the—which includes the class action waiver, was part of the summary part of the document but rather part of the—the plan itself.

35

ROA 13-40693 911.

Furthermore, the overall structure and content of the Compensation Plans show that they were the *primary* document governing plaintiffs' compensation while employed at UBSFS, not mere summaries of PartnerPlus. The Compensation Plans establish the principal components of plaintiffs' compensation, only one aspect of which was participation in PartnerPlus. ROA 13-40693 2461–96.

Indeed, it is the Compensation Plans—not PartnerPlus—that provide the employee eligibility requirements for PartnerPlus participation. They are also the only documents that establish the sources of compensation that can be deferred to that program. ROA 13-40693 2593–96. Without the requirements and logistics set forth in the Compensation Plans, PartnerPlus could not function. *Cf. Robinson Brog Leinwand Greene Genovese & Gluck, P.C. v. John M. O'Quinn & Assocs., L.L.P.*, 2013 WL 1707897, at *2 (2d Cir. Apr. 22, 2013) (compelling arbitration under clause in one of several related agreements that was "the foundation of these interdependent documents," without which there was not "even a basis for generating … the pool of funds" at issue).[3]

---

[3] Even if the Compensation Plans were not the primary agreements governing resolution of the parties' employment-related disputes and instead were simply informal, secondary agreements, any informality in the Compensation Plans' text or formatting would not be a basis to reject the validity of their arbitration provision and class waiver. *See Casarotto*, 517 U.S. at 686 (rejecting state-law requirements holding arbitration agreements to higher contract-formation standards than required for other agreements under state law).

To be sure, the Compensation Plans state that the PartnerPlus text controls in the event of a "conflict between the *summary of the plans* set forth in this brochure and the Plan Documents" or "any difference between this summary and the Plan Document."  ROA 13-40693 2593, 2596 (emphasis added).  But those statements refer only to a conflict between the "summary" of PartnerPlus in the Compensation Plans and the actual text of PartnerPlus; they are therefore inapplicable to any perceived conflict in the documents' arbitration provisions.  The Compensation Plans' arbitration provision is *not* a mere summary, and does not appear within the summary of PartnerPlus.  Therefore, the provision on which plaintiffs rely is inapplicable.

Moreover, there is no "conflict" or "difference" between the class waiver and PartnerPlus at all.  Like PartnerPlus, the Compensation Plans each contain a broad arbitration provision directing plaintiffs to bring "all" disputes relating to the forfeiture of PartnerPlus funds in arbitration.  As there can be no argument that the class waiver provision is in conflict with the *Compensation Plans'* arbitration agreement—indeed, the two provisions are on the same page in the Compensation Plans—it strains credulity that it could conflict with PartnerPlus's essentially identical arbitration provision simply because PartnerPlus is a separate UBSFS agreement.

In any event, the fact that one plan contains an *additional* provision does not mean that the two plans are in *conflict*. In *Place St. Charles v. J.A. Jones Construction Co.*, 823 F.2d 120 (5th Cir. 1987), for instance, this Court gave effect to an arbitration provision in a separate agreement—despite an explicit statement that the primary agreement trumped "in the event of a dispute" between the two—because the wording of the relevant provisions was "not necessarily inconsistent," and thus there was no "conflict." *Id.* at 123; *cf. Lee v. Flightsafety Servs. Corp.*, 20 F.3d 428, 431 (11th Cir. 1994) (a "difference between … two statutes is not a conflict" where provisions "are not mutually exclusive"). Nothing about plaintiffs' agreement not to participate in class or collective actions is incompatible with their separate agreement to resolve all disputes in arbitration—read together, these agreements simply require plaintiffs to bring their claims in *individual* arbitrations.

This common-sense conclusion that an additional provision is not enough to constitute "conflict" is fully consistent with this Court's responsibilities under the FAA. Indeed, it was the FAA's liberal policy favoring arbitration that caused this Court to conclude it was *required* to read the *Place St. Charles* agreements consistently if at all possible. *See* 823 F.2d at 123. Similarly, the Compensation Plans and PartnerPlus must be read and construed harmoniously—which the magistrate judge did not do—particularly given the interrelationship between the documents. As this Court said in *Safer v. Nelson Financial Group, Inc.*, 422 F.3d 289 (5th Cir.

2005), "when agreements are interdependent and exist to further a single goal, an arbitration clause in one of the agreements reaches all aspects of the parties' relationship." *Id.* at 296 (internal quotation marks omitted); *see also Tittle v. Enron Corp.*, 463 F.3d 410, 419 (5th Cir. 2006) (multiple agreements relevant to scope of arbitration provision must, if possible, be read together as a coherent whole). "'[H]armoniz[ing]'" separate agreements between parties is essential to ensure that parties' arbitration agreements are enforced as the FAA requires. *Preston*, 552 U.S. at 363 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63–64 (1995)).[4]

4. Reading the Compensation Plans and PartnerPlus harmoniously and resolving all doubts in favor of arbitration make it impossible to reject an interpretation mandating individual arbitration. The court below was (and this Court is) required to resolve "any doubts concerning the scope of arbitrable issues ... in favor of arbitration": "[A]s with any other contract, the parties' intentions control, but those intentions are *generously* construed as to issues of arbitrability." *Mitsubishi Motors*, 473 U.S. at 626 (emphasis added); *see also Moses H. Cone*, 460 U.S. at 24–25 (ambiguity must be resolved in favor of arbitration even where "the problem

---

[4] Even if the Compensation Plans' class waiver could be construed as a mere "summary brochure" (which it cannot), this argument would be unavailing for the named plaintiffs in *Hendricks*, who—in addition to agreeing to the Compensation Plans' terms—agreed to a *separate*, substantially identical arbitration provision and class waiver in their respective Letters of Understanding. ROA 13-40692 2674–76, 2684–89.

at hand is the construction of the contract language itself"). Where the FINRA rule in question both allows parties to elect against participation in class claims—with no limitation on when that election must occur—*and* expressly allows for separate agreements modifying the default rule that the FINRA forum is not available for arbitration of class claims, this Court cannot say with "*positive assurance* that the arbitration clause is *not susceptible* of an interpretation that covers the asserted dispute." *AT&T Techs.*, 475 U.S. at 650 (emphasis added).

In any event, even if the magistrate judge's contrary reading of FINRA's procedural rules were correct (which it was not), FINRA procedural rules cannot invalidate an arbitration agreement. FINRA's rules, at most, govern the conduct of arbitrations in that forum; they do not, and cannot, affect the enforceability of arbitration agreements in federal court. The FAA's mandate to enforce valid arbitration agreements according to their terms applies even to "federal statutory claims" such as plaintiffs' ERISA claims, unless the FAA "has been overridden by a contrary congressional command." *CompuCredit*, 132 S. Ct. at 669 (internal quotations omitted); *see also*, *e.g.*, *Italian Colors*, 133 S. Ct. at 2309–10 (courts must "rigorously enforce" arbitration agreements absent a congressional command to the contrary); *id.* at 2311 (rule applies even to statutes that "expressly permit[] collective actions") (citing *Gilmer*, 500 U.S. at 32).

In the rare instances in which Congress has chosen to preclude contractual arbitration, it has clearly and expressly displaced the FAA regime. *See Compu-Credit*, 132 S. Ct. at 672 (Congress does not displace the FAA's mandate in an "obtuse" manner) (citing, *inter alia*, 7 U.S.C. § 26(n)(2) ("No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section")). Nothing in FINRA's statutory authorization provides anything like the clear and unequivocal congressional command that is an essential prerequisite to rendering unenforceable a contractual arbitration provision otherwise subject to, and enforceable under, the FAA. *See Kramer v. Smith Barney*, 80 F.3d 1080, 1084 (5th Cir. 1996) ("Congress did not intend to exempt statutory ERISA claims from the dictates of the [FAA]").

As the party opposing arbitration, plaintiffs bear the burden of showing the existence of a clear congressional command that could justify allowing FINRA rules to trump the FAA. *See Shearson*, 482 U.S. at 227. But they have not even tried to meet this burden. Nowhere in the Securities Exchange Act of 1934 did Congress authorize—much less command—FINRA to impose limitations on the rights of member firms and associated persons under the FAA to enter into and enforce arbitration agreements that include class waivers: "Simply put, nothing in the Securities Act … manifests a congressional intent to limit or prohibit waiver of a judicial forum for a particular claim, or to abridge the sweep of the FAA." *Sec.*

*Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1121 (1st Cir. 1989). Because the FINRA rules do not reflect a clear congressional command to prohibit arbitration, "the FAA requires the arbitration agreement to be enforced according to its terms." *CompuCredit*, 132 S. Ct. at 673. Thus, even if there were a conflict between plaintiffs' class waiver and FINRA rules, the FAA's liberal policy favoring arbitration would still dictate that plaintiffs' claims must be resolved in arbitration.

### B.     ERISA Does Not Preclude Arbitration Here

The magistrate judge also refused to enforce the Compensation Plans' class waiver provision on the ground that it was an "amendment" to PartnerPlus that failed to comply with the statutory procedures for amending ERISA-governed retirement plans. To reach this conclusion, the magistrate judge first had to "accept" plaintiffs' contention that PartnerPlus is an ERISA plan—while expressly stating that this issue would actually be "determined at a later date"—and then decided that the Compensation Plans' class waiver could not be enforced because it modified that plan in a manner inconsistent with ERISA amendment rules. ROA 13-40693 971–72. The court was wrong on both counts.

1. Plaintiffs' opposition to arbitration cut straight to the merits of the case: Plaintiffs' claims in the underlying action primarily turn on whether PartnerPlus is an ERISA plan. If it is not, plaintiffs lack any legal basis to challenge the plan's vesting and funding provisions. By assuming that PartnerPlus is an ERISA plan,

the court necessarily engaged with the merits of the parties' central dispute. The magistrate judge's approach—adopted by the district court—is well beyond the legitimate purview of a court on a motion to compel.

The courts' "very limited" role in compelling arbitration (*Paper, Allied-Indus.*, 449 F.3d at 619) does not permit the kind of inquiry into a core merits dispute that the court below undertook here. Courts "have no business weighing the merits of the grievance . . . [or] determining whether there is particular language in the written instrument which will support the claim." *AT&T Techs.*, 475 U.S. at 650 (internal quotation marks omitted); *see also Paper, Allied-Indus.*, 449 F.3d at 619 (courts' inquiry must "*[i]n no way*" involve consideration of "the merits of the claim") (emphasis added). Indeed, courts may not engage with any issues in the case beyond whether "'the party seeking arbitration is making a claim which *on its face* is governed by the contract.'" *Paper, Allied-Indus.*, 449 F.3d at 619 (emphasis added) (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960)). As discussed above, that inquiry involves only (1) whether there is a valid arbitration agreement that (2) covers the claims at issue.

The magistrate judge compounded his initial error by *assuming*, without deciding, that PartnerPlus is governed by ERISA. The magistrate judge "accept[ed] . . . at this time" that PartnerPlus is an ERISA plan, then held that the class waiver provision in the Compensation Plans could not "modify the arbitration

clause in the PartnerPlus Plan" because it constituted an invalid amendment under ERISA.  ROA 13-40693 971–72.

The magistrate judge's recognition that "[w]hether or not [PartnerPlus] actually is [an ERISA] plan is a matter that will have to be determined at a later date," and that his interim ruling on the ERISA issue would be subject to "reconsider[ation]" (ROA 13-40693 971–72), proves—at the very minimum—that UBSFS's position that PartnerPlus is not an ERISA plan is plausible.  And where there are two possible interpretations—one that favors arbitration and one that does not—the court is *required* to adopt the reading that favors arbitration.  *See AT&T Techs.*, 475 U.S. at 650; *see also supra* pp. 20–21.  Therefore, if the court were permitted, consistent with the FAA, to assume anything at this stage, it should have assumed that PartnerPlus is *not* an ERISA plan if doing so would have favored arbitration.  The magistrate judge's contrary assumption—and the district court's apparent acceptance of that assumption—flips the statutory presumption favoring arbitrability on its head.  That this case is now going forward in court, but may later—at the merits stage—be determined to belong in arbitration because PartnerPlus is not an ERISA plan, shows that the lower court did the exact opposite of what the Supreme Court's precedents require.

2.  In any event, PartnerPlus is not an ERISA plan.  Plaintiffs themselves appear to recognize this fact, abandoning their prior arguments on this point in their

stay papers in this Court, and relying instead on the implausible argument that the Compensation Plans are mere "summary brochures," and that there is a conflict between the arbitration provisions in the Compensation Plan and PartnerPlus.  It is not hard to see why plaintiffs did not defend the magistrate judge's ERISA ruling. A deferred compensation plan like PartnerPlus is governed by ERISA only if it provides retirement income or results in the deferral of income to the termination of employment or beyond (*see* 29 U.S.C. § 1002(2)(A)), and this Court has made clear that ERISA regulates a plan only when the plan's "primary thrust" is to provide retirement income, rather than to "reward employees during their active years," *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (5th Cir. 1980); *Boos v. AT&T, Inc.*, 643 F.3d 127, 134 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 816; *see also* 29 U.S.C. § 1002(2)(A).

The relevant versions of PartnerPlus state expressly that it is *not* an ERISA plan:  "The Plan is not intended to be subject to ERISA and shall be construed and administered accordingly."  ROA 13-40693 2426.  Instead, its primary thrust is not to provide retirement income, but to "retain and motivate" eligible financial advisors and branch managers by providing bonuses in addition to regular compensation in recognition of high performance.  ROA 13-40693 2426.  Courts have consistently and explicitly held that plans with this purpose are *not* designed to provide retirement income.  *See, e.g.*, *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 188–89

(3d Cir. 2003); *Tolbert v. RBC Capital Mkts. Corp.*, 2013 WL 3503286, at \*6, \*13 (S.D. Tex. Mar. 27, 2013) (Ellison, J.) (similar plan was not governed by ERISA because it had "no express terms for providing retirement or termination/post-termination income to employees" and employees received "in-service distributions" during employment), *appeal docketed*, No.13-20213 (5th Cir. 2013).

Indeed, Department of Labor regulations specify that a bonus program, like PartnerPlus, is not an ERISA plan unless the bonuses are "systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c).

The structure of PartnerPlus reinforces that it is not a retirement plan, as a leading national authority on compensation in the financial services industry, Alan Johnson, explained in his report below.  ROA 13-40693 2940–41.  Firm contributions and interest on all contributions begin vesting after six years and are fully vested after ten years.  ROA 13-40693 2432–33.  And once contributions and interest fully vest, PartnerPlus mandates that the vested benefits be distributed, *even if the participant is still employed by UBSFS.*  ROA 13-40693 2436.  Plans such as PartnerPlus—which defers income for a fixed period of years, rather than until retirement or termination—are not expressly designed to provide retirement income. *See, e.g., Serio v. Wachovia Sec., LLC*, 2007 WL 2462626, at \*4 (D.N.J. Aug. 27, 2007); ERISA Op. Letter 98-02A (Mar. 6, 1998).  And a plan that "does not ex-

46

pressly condition distribution of the bonus payments upon termination of employ-

ment or retirement . . . is not by its express terms a pension plan within the mean-

ing of section 3(2)(A) of ERISA." ERISA Op. Letter 98-02A; *see also* ERISA Op.

Letter 84-12A ("because the Plan does not condition distribution of the amount

deferred upon termination of employment, retirement, *or any other circumstances*

*other than the passage of a fixed period of time*, the Plan is not by its express terms

an employee pension benefit plan") (emphasis added).

PartnerPlus also operated during the proposed class period precisely as its

structure and stated intent indicate it would—as a retention tool, not a retirement

plan. ROA 13-40693 2941. As a 2010 Offering Memorandum for PartnerPlus ex-

plained, the plan operated so that "most of the Contributions and Interest credited

[] under PartnerPlus will be paid to [participants] while [they are] still working for

the Company." ROA 13-40693 2805, 2833. For example, out of approximately

$1.2 billion that PartnerPlus distributed to financial advisors, over $900 million, or

more than 70%, was paid to participants *while active employees at UBSFS*. ROA

13-40693 3015. And under the Branch Manager Plan, more than 51% of the total

dollar-value of the plan was paid to participants while they were still employed by

UBSFS. *See* ROA 13-40693 3015. Furthermore, the overwhelming majority of

distributions were made to participants under age 65, which is generally recog-

nized as normal retirement age. The median age of participants when they last re-

ceived a payment from the Financial Advisor Plan is 52.4.  ROA 13-40693 3019.

Indeed, almost 80% of the participants in the Financial Advisor Plan received their

last payment before age 65.  ROA 13-40693 3019.  Similarly, the median age of

participants in the Branch Manager Plan when they received their last payment was

54, and almost 87% of branch managers received their last payments from the Plan

before age 65.  ROA 13-40693 3019.

Retirement plans are, of course, intended to make payments to participants

when they have *retired*, not while they are still working for the employer.  A re-

tirement plan in which about 70% of disbursements are made to participants while

still employed by UBSFS and in which more than 80% of participants receive all

their money from the plan before reaching normal retirement age would be a

strange retirement plan indeed.  *See McKinsey v. Sentry Ins.*, 986 F.2d 401, 406

(10th Cir. 1993) (plan was a "deferred compensation plan" and not subject to

ERISA); *Houston v. Saracen Energy Advisors, LP*, 2009 WL 890384, at *4 (S.D.

Tex. Mar. 27, 2009) (plan "[was] not an ERISA plan" even though deferred com-

pensation "may run into a participant's retirement or the termination of his em-

ployment").

Tellingly, plaintiffs have no quarrel with one feature of PartnerPlus that is

fundamentally inconsistent with ERISA: the in-service distributions.  It is only af-

ter pocketing hundreds of thousands of dollars from that distinctly non-retirement

benefit that plaintiffs decided that PartnerPlus should resemble a retirement plan after all. They want to have their cake and eat it, too.

3. In any event—ERISA plan or not—the magistrate judge incorrectly concluded that the Compensation Plans "amended" PartnerPlus. PartnerPlus provides for arbitration pursuant to FINRA rules, which preclude arbitration of class claims only in the absence of "any other agreement" on point. *See supra* pp. 32–34. The class waiver language in the Compensation Plans is such an agreement. As such, it *implements* the PartnerPlus arbitration provision by simply ensuring that all disputes arising from plaintiffs' employment with UBSFS or termination of that employment relationship are resolved through arbitration.

Because the Compensation Plans do not contradict any language in PartnerPlus, the class waiver provision does not violate ERISA's amendment rules. If anything, the "any dispute, claim, or controversy" clause in PartnerPlus suggests the agreement contemplated that *all* claims arising from PartnerPlus would be resolved through arbitration—a result the Compensation Plans ensure. *See, e.g., Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 85–86 (2d Cir. 1998) (change contemplated by plan was not an amendment); *Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1221 (9th Cir. 1988) (change not amendment because it applied a plan provision); *Stewart v. Nat'l Shopmen Pension Fund*, 730 F.2d 1552,

1561 (D.C. Cir. 1984) (no "amendment" when a "provision already incorporated into the plan [is] *applied*").

4. Finally, even if PartnerPlus were an ERISA plan (which it is not) and even if the class waiver constituted an "amendment" of PartnerPlus (which it does not), the district court still erred in not ordering arbitration because, to the extent there is a conflict between ERISA's modification rule and the FAA's mandate to enforce arbitration agreements according to their terms, the ERISA rule must yield. ERISA does not contain the "contrary congressional command" necessary to override the FAA's mandate to enforce arbitration agreements according to their terms. *CompuCredit*, 132 S. Ct. at 669 (internal quotation marks omitted); *see also Sutherland*, 2013 WL 4033844, at *5 (finding no contrary congressional command despite facts that the statute under which plaintiffs brought claims "'provides for the possibility of bringing a collective action'" and that arbitration might not be able to "'go forward as a class action or class relief [might] not be granted by the arbitrator'") (quoting *Gilmer*, 500 U.S. at 32). To the contrary: ERISA itself makes clear that nothing in its text "shall be construed to alter, amend, invalidate, impair or supersede any law of the United States." 29 U.S.C. § 1144(d); *see also Rosenblum v. Drexel Burnham Lambert Inc.*, 700 F. Supp. 874, 876 (E.D. La. 1987) (ERISA's text establishes that courts must comply with the FAA's requirement to enforce arbitration agreements). As this Court has emphasized, this language, combined

with the rest of ERISA's text and legislative history, shows that "Congress did not intend to exempt statutory ERISA claims from the dictates of the [FAA]." *Kramer v. Smith Barney*, 80 F.3d 1080, 1084 (5th Cir. 1996); *see also, e.g., Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1119, 1122 (3d Cir. 1993) (ERISA claims subject to compulsory arbitration under the FAA); *Bird v. Shearson Lehman/Am. Express, Inc.*, 926 F.2d 116, 120 (2d Cir. 1991) (same).

In other words, the class waiver provision of the Compensation Plans is enforceable under the FAA whether or not it complies with ERISA's amendment procedures. The district court erred in concluding otherwise.

\* \* \*

The named plaintiffs each agreed to two valid arbitration provisions and a class action waiver that indisputably cover the very claims plaintiffs brought in this lawsuit. This Court is tasked under the FAA only with determining the validity and coverage of these agreements, and there are no grounds within the authorized scope of judicial inquiry to allow plaintiffs to evade their agreements to resolve any compensation-related disputes with UBSFS through individual arbitrations. Neither is there any basis in FINRA forum rules or ERISA's amendment procedures for a court to refuse to enforce these agreements. Those were inquiries the district court should never have undertaken, and that could not justify the order under review in any event. Consistent with the FAA and more than twenty years of

clear Supreme Court and Circuit guidance, this Court should honor the parties' agreements to resolve the underlying disputes in individual arbitration proceedings.

## CONCLUSION

The Court should reverse the district court's order and direct that the named plaintiffs' claims be sent to individual arbitrations.

Date: August 15, 2013

Respectfully submitted,

s/ Mark A. Perry

Mark A. Perry
Eugene Scalia
Paul Blankenstein
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Attorneys for Defendant-Appellant UBS Financial Services Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2013, an electronic copy of the foregoing Appellant's Opening Brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon registered CM/ECF participants.

s/ Mark A. Perry
Mark A. Perry
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,309 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 (version 14) in Times New Roman 14-point font.

Dated:  August 15, 2013

s/ Mark A. Perry
Mark A. Perry
GIBSON, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036